1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10    EUGENE ACEVEDO,                    CASE NO. 12-CV-459-BEN (MDD)

11                          Plaintiff,    **DECISION WITH FINDINGS OF**
                                          **FACT AND CONCLUSIONS OF**
12          vs.                           **LAW**

13    UNITED STATES OF AMERICA,

14                          Defendant.

15

        Plaintiff Eugene Acevedo filed a Complaint against the United States pursuant

16   to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680.  Plaintiff

17   claims that the Veterans Administration Medical Center in San Diego (VAMC)

18   negligently failed to diagnose and treat a subdural hematoma, resulting in physical,

19   emotional, and cognitive injuries.

20        A bench trial was held before this Court for four days between April 1, 2014 and

21   April 9, 2014.  Pursuant to Federal Rule of Civil Procedure 52(a), this Court now

22   makes the following findings of fact and conclusions of law.  Where appropriate,

23   findings of fact shall operate as conclusions of law, and conclusions of law shall

24   operate as findings of fact.

25        In view of this Court's findings and conclusions, this Court finds that Plaintiff

26   has not proven by a preponderance of the evidence that the actions of Defendant's

27   employees fell below the standard of care, or that any failure to meet the standard of

28   care caused Plaintiff's damages.  The Court therefore finds in favor of the United States

1  and against Eugene Acevedo.  Defendant's Rule 52 Motion for  Judgment on Partial
2  Findings is **DENIED AS MOOT**.  (Docket Nos. 44, 45).

3                                  **FINDINGS OF FACT**

4       Plaintiff Eugene Acevedo was born in 1951.  At the age of approximately 19
5  years old, he joined the Marine Corps.  He was honorably discharged two years later.

6       Plaintiff has a history of using controlled substances and alcohol.  He began
7  using drugs and alcohol at the approximate age of fourteen years old.  In the 1980s,
8  Plaintiff began to use cocaine, approximately twice a week, and methamphetamine,
9  approximately three or four times a week.  Plaintiff worked in construction until he
10 entered into an alcohol and drug treatment program in 2008.  Plaintiff reports using
11 marijuana about once a day.  There is no evidence that Plaintiff has abused other
12 controlled substances or alcohol since completing the rehabilitation program.

13      Plaintiff was diagnosed with gastrointestinal problems around 2007.  He
14 underwent multiple abdominal surgeries to treat his conditions in late 2009 and 2010.
15 After the abdominal surgeries, Plaintiff developed a problem with blood clots.  To
16 address the potentially dangerous blood clots, Plaintiff was placed on Coumadin, an
17 anticoagulant, on August 24, 2010.  Plaintiff was also placed on a number of different
18 pain medications following the abdominal surgery.

19      Plaintiff began reporting headaches in the Fall of 2010.  Prior to the Fall of 2010,
20 Plaintiff reports that he had last experienced severe headaches approximately 40 years
21 earlier, when he was leaving the Marine Corps.  Plaintiff remembers being told by a
22 medical provider that these headaches were migraines.

23      On September 18, 2010, Plaintiff presented at the Emergency Department of the
24 VAMC. He reported experiencing a headache for two days.  He subjectively reported
25 a pain level of 7 on a scale of 1 to 10.  A computerized tomography (CT) scan of
26 Plaintiff's head was performed.  The CT scan revealed no intercranial bleeding.
27 Plaintiff was given medication, and reported improvement.  He was then discharged.
28      Plaintiff reported to the VAMC Emergency Department again on September 20,

1    2010.  Plaintiff complained of a headache and presented with a fever.  His treating
2    physician was concerned that Plaintiff could be suffering from meningitis, and
3    recommended that Plaintiff undergo a CT scan and lumbar puncture.  The CT scan was
4    offered in conjunction with the lumbar puncture, and was recommended in order to
5    ensure that the lumbar puncture could be safely performed.  Plaintiff did not want to
6    undergo the lumbar puncture and refused the treatment advised by the physician.

7         Plaintiff was next seen by the VAMC Emergency Department on October 22,
8    2010.  Plaintiff presented with complaints of a headache.  He reported that he had been
9    experiencing headaches for four days, and reported a pain level of 10 out of 10.
10   Plaintiff was nauseous and vomited while in the Emergency Department.  Plaintiff was
11   given medication, reported improvement, and was discharged.  The doctor also referred
12   him to a neurologist.

13        Plaintiff was seen by his primary care provider, a nurse practitioner, on
14   November 4, 2010. He reported experiencing headaches.  The nurse practitioner noted
15   that Plaintiff was having difficulty concentrating.  She prescribed propranolol, a
16   medication that can prevent headaches.

17        Plaintiff was seen on December 1, 2010 by a neurology attending physician and
18   a resident.  Plaintiff reported that he had improved after he had begun to take the
19   propranolol, and had stopped taking the medication.  He had resumed the medication
20   three days before the appointment.  The neurology attending physician, Dr. Bui
21   interpreted this history to support the conclusion that the drug had been effective in
22   treating a primary headache.  A full neurological examination of Plaintiff was
23   performed.  The only notable finding was some difficulty with "tandem walking,"
24   which involves placing one foot directly in front of the other while walking in a line.
25   Dr. Bui stated that this is not very helpful by itself in the case of the elderly.  There
26   were no other abnormalities, and Plaintiff's mental status was normal.  Plaintiff was
27   diagnosed with migraine and tension headaches, and given additional medication.

28        Plaintiff reported to the Emergency Department on December 3, 2010, reporting

1   a headache lasting two days, nausea, and photophobia.  Dr. Xue performed a physical
2   examination and neurological examination, and found no neurological abnormalities.
3   Dr. Xue ordered medication and kept him for observation, then passed responsibility
4   for his care to Dr. Busby at the shift change.  Dr. Busby re-examined Plaintiff and
5   added additional medication.  Plaintiff reported improvement, and was discharged
6   home.

7        On the morning of December 5, 2010, Plaintiff experienced a severe headache.
8   He telephoned a friend, Jennie Selby, who took him to the VAMC Emergency
9   Department.  After waiting approximately one hour, Plaintiff left the VAMC.  Ms.
10  Selby took Plaintiff to Scripps Mercy Hospital.  At Scripps Mercy Hospital, a CT scan
11  was ordered within approximately ten minutes.  The CT scan showed evidence of
12  subdural hematomas.

13       A subdural hematoma is a condition in which blood collects above the brain,
14  below the skull and the dura mater.  Signs and symptoms can include headache, a
15  variety of neurological signs, nausea, and vomiting.  Risk factors for a subdural
16  hematoma include, but are not limited to, use of anticoagulants, liver dysfunction, age,
17  and being male.

18       Plaintiff's December 5 CT scan showed evidence of both a chronic subdural
19  hematoma, and an acute subdural hematoma.[1]  The chronic subdural hematoma was an
20  intercranial bleed that began some time after Plaintiff's negative CT scan on September
21  18, but likely at least two weeks before the December 5, 2010.  The acute subdural
22  hematoma likely began approximately 1-2 days before the December 5 CT scan.

23       After the CT scan revealed the subdural hematomas, Scripps Mercy Hospital
24  took Plaintiff off of Coumadin and took steps to reverse its effects.  A craniotomy was
25  performed by Scripps Mercy Hospital on December 6, 2010 to drain the blood.

26       Plaintiff reports a number of life changes following his craniotomy.  Among
27
28       [1]The terms "chronic" and "acute" have been used by different witnesses to refer
    to hematomas of different ages.  The Court uses these terms generally, to refer to the
    older and newer brain bleeds.

1    other complaints, Plaintiff states that he has struggled with depression and anxiety.
2    Although he was previously an active volunteer in the community, Plaintiff has become
3    more isolated.  He reports problems with his memory and other cognitive functions.
4    Plaintiff also suffered headaches and pain after his craniotomy.

5                              **CONCLUSIONS OF LAW**

6          In an FTCA action, the Court applies the law of the state in which the alleged act
7    or omission occurred.  28 U.S.C. § 1346(b)(1).  Accordingly, this Court applies the
8    substantive law of California.  The Government's liability is determined in the same
9    manner and to same extent as a private individual in like circumstances.  28 U.S.C.
10   §§ 1346(b), 2674.

11         Plaintiff's sole cause of action is for medical malpractice.  Plaintiff has the
12   burden of establishing the necessary elements by a preponderance of the evidence.
13   *Johnson v. Super. Ct.*, 143 Cal. App. 4th 297, 304-05 (3d Dist. 2006).  He is required
14   to prove that the standard of care was not met, and that the failure to meet the standard
15   of care caused Plaintiff damages.  *See id.*

16         Plaintiff presented evidence to argue that the standard of care was not met on
17   four occasions: October 22, November 4, December 1, and December 3.  Plaintiff did
18   not argue that the elements were met on September 18 or 20, before Plaintiff claims the
19   chronic subdural hematoma was present, or present evidence of medical malpractice
20   as to any of Plaintiff's other visits to the VAMC.  He did not present any evidence that
21   medical malpractice took place on December 5, the date on which he left the VAMC
22   before being seen by a physician.  Plaintiff also did not argue that any nurses
23   committed medical malpractice, with the exception of his primary care provider, the
24   nurse practitioner who saw him on November 4, 2010.

25    A.  Standard of Care

26         Plaintiff did not meet his burden of showing that the actions of Defendant's
27   employees fell below the standard of care.  A physician is required to exercise, in
28   diagnosis and treatment, the reasonable degree of skill, knowledge, and care ordinarily

1   possessed and exercised by members of the medical profession in the community under
2   similar circumstances. *Mann v. Cracchiolo*, 38 Cal. 3d 18, 36 (1985); *Lawless v.*
3   *Calaway*, 24 Cal. 2d 81, 86-87 (1944). The standard of care is a matter "peculiarly
4   within the knowledge of experts," and can only be proved by expert testimony, "unless
5   the conduct required by the particular circumstances is within the common knowledge
6   of the layman." *Landeros v. Flood*, 17 Cal. 3d 399, 410 (1976) (citations omitted).
7   The fact that another physician or surgeon may have chosen to treat the case differently
8   or use different methods does not of itself establish negligence. *Lawless*, 24 Cal. 2d
9   at 87. In determining whether the standard of care was met, this Court cannot use
10  hindsight. "[I]n treating a patient, a physician can consider only what is known at the
11  time he or she acts." *Vandi v. Permanente Medical Grp., Inc.*, 7 Cal. App. 4th 1064,
12  1070 (3d Dist. 1992). This Court concludes that the medical providers acted
13  reasonably and provided medical treatment that met the standard of care, given the
14  facts before them.

15       In determining the standard of care, this Court heard testimony from three expert
16  witnesses. This Court carefully considered the reasoning used by the experts,
17  examined the basis for their opinions, and observed their live testimony. Plaintiff
18  argued that the standard of care called for the physicians to order a CT scan for
19  Plaintiff. The CT scan more likely than not would have allowed Plaintiff's doctors to
20  see that he was experiencing a chronic subdural hematoma, assuming the subdural
21  hematoma existed at that time. However, as discussed below, the evidence before this
22  Court does not demonstrate by a preponderance of the evidence that the doctors were
23  required to order an additional CT scan to meet the standard of care.

24       Plaintiff and his expert point to guidelines published by the American College
25  of Emergency Physicians (ACEP) in 2008 to argue that CT scan should have been
26  ordered on each presentation in question. In "Clinical Policy: Critical Issues in the
27  Evaluation and Management of Adult Patients Presenting to the Emergency
28  Department with Acute Headache," ACEP published recommendations addressing

1   when a patient presenting to an emergency department with a headache should receive
2   neuroimaging. (Joint Ex. J-18). There are two relevant Level B recommendations,
3   which are recommendations that "may identify a particular strategy or range of
4   management strategies that reflect moderate clinical certainty." The first "Level B"
5   recommendation states that a patient presenting with a "headache and new abnormal
6   findings in a neurological examination (eg, focal deficit, altered mental status, or
7   altered cognitive function) should undergo" an emergent head CT scan. The second
8   Level B recommendation states that a patient with "new sudden-onset severe headache
9   should undergo" an emergent head CT scan. Finally, there is a Level C
10  recommendation, which is a recommendation based on "preliminary, inconclusive, or
11  conflicting evidence, or, in the absence of any published literature, based on panel
12  consensus." The Level C recommendation is that a patient "should be considered" for
13  an urgent neuroimaging study if the patient is over 50 years old and has a "new type
14  of headache but with a normal neurological examination."

15      None of the ACEP guidelines listed establish a standard of care that Plaintiff's
16  treating physicians failed to meet. Assuming that the two different Level B
17  recommendations are sufficiently accepted in the community to define the standard of
18  care, these recommendations did not apply to Plaintiff's presentation. Plaintiff
19  presented with a severe headache, but his neurological examinations were negative.
20  Plaintiff pointed to only two possible neurological signs of a subdural hematoma, and
21  treatment providers in both cases presented adequate reasoning for not finding the
22  symptom significant. Although Plaintiff was noted to have difficulty concentrating on
23  November 4, he demonstrated no other neurological symptoms, was experiencing pain,
24  and was on a number of pain killers. The November 4 presentation also did not take
25  place in an emergency department. Additionally, although Plaintiff experienced some
26  difficulty with "tandem walking" on December 1, his neurologic exam was otherwise
27  unremarkable and Plaintiff presented no evidence to undermine Dr. Bui's conclusion
28  that difficulty with tandem walking was not significant in the case of an older patient

1  such as Plaintiff.

2       With regard to the second Level B recommendation, Plaintiff did not show that
3  he presented with a "new sudden-onset severe headache" on any of his presentations.
4  Each time, he had been experiencing the headache for several days, and there is no
5  evidence of sudden onset.

6       Finally, Plaintiff has not demonstrated that the standard of care required
7  following the Level C recommendation, or that this recommendation applied to his
8  presentation.  The lack of evidence to support implementing this recommendation
9  severely undermines its use as the standard of care.  This Court also notes that
10 physicians are only told that neuroimaging should be "considered."  The doctors appear
11 to have considered the possibility of a subdural hematoma, but deemed the CT scan
12 unnecessary under the circumstances.  Most critically, however, Plaintiff has not
13 demonstrated that he presented with a "new" type of headache.  At each contested
14 presentation, Plaintiff presented with a headache.  Plaintiff's medical records, which
15 were available to his doctors and reviewed prior to treatment, revealed that Plaintiff
16 had experienced a severe headache on September 18.  The records also revealed that
17 Plaintiff had received a CT scan during that presentation, and that the scan was
18 negative.  Plaintiff therefore had a medical history that included a recent, severe
19 headache not caused by intercranial bleeding. Although his subjective reports of his
20 own pain varied somewhat, Plaintiff did not present with new, significant neurological
21 findings.  Although nausea and vomiting accompanied the headache on October 22,
22 Plaintiff presented no evidence to undermine the conclusion of the treating physicians
23 that such symptoms were not particularly concerning given that they commonly occur
24 with severe headaches.

25      In arguing that a CT scan should have been ordered at each presentation,
26 Plaintiff points to the fact that he had a number of risk factors which made a subdural
27 hematoma more likely and/or more dangerous.  Specifically, Plaintiff was an
28 approximately 59-year-old man, taking Coumadin, and with a medical history that

1  included several risk factors.  Plaintiff's expert testified that Coumadin made it "four
2  to five times" more likely that it was something bad, such as a bleed.  Plaintiff's expert
3  testified that a CT scan should therefore have been ordered every time Plaintiff
4  presented with a headache.

5      However, this conclusion was disputed by Defendant's expert witnesses, and is
6  not required by any authoritative guidelines.  Although it may be the medical opinion
7  of Plaintiff's expert that a CT scan should be ordered each time, there was no evidence
8  that this is the standard in this community.  The presence of risk factors does not
9  change the fact that Plaintiff presented with symptoms similar to a recent headache not
10  caused by a subdural hematoma.

11      The Court also notes that multiple treating physicians expressed a concern with
12  unnecessarily exposing Plaintiff to radiation.  Where a patient presents with signs and
13  symptoms similar to a recent headache not caused by intercranial bleeding, the doctor
14  performs a proper examination and conducts a proper history, and no significant new
15  symptoms are observed, this Court cannot find that it was unreasonable for his treating
16  physicians not to order a test which would expose the patient to additional dangerous
17  radiation.  Plaintiff's expert testified that Plaintiff should have been given a CT scan
18  every time he presented with a headache.  This Court cannot find it unreasonable that
19  Defendant's doctors did not expose Plaintiff to radiation every single time he presented
20  with a headache.

21      Review of each of the contested presentations indicates that Plaintiff's treating
22  physicians acted reasonably in deciding not to order a CT scan, and that their diagnoses
23  and treatment of Plaintiff did not fall below the standard of care.

24      Plaintiff has not proven that the standard of care was not met on October 22.
25  He was examined by a physician and received a neurological exam.  Plaintiff presented
26  with a similar headache, and no neurological findings.  Although he reported 10 out of
27  10 pain, this was a subjective report and not clearly dissimilar from the September
28  headaches.  Plaintiff's medical records indicated that he had presented with a severe

1   headache on September 18, and that the CT scan did not reveal any intercranial

2   bleeding.  Plaintiff reported responding well to medication before he was discharged

3   home.   Finally, the emergency room doctor referred Plaintiff to neurology, the

4   department which has expertise in headaches.  Given the similarity of the headache to

5   the recent headache not due to subdural hematoma, the clean neurological exam, the

6   effectiveness of treatment in resolving his symptoms, and the effort to refer Plaintiff

7   to headache experts, this Court cannot find that Plaintiff has established by a

8   preponderance of the evidence that the standard of care was not met.

9           Plaintiff has not proven that the standard of care was not met on November 4,

10   2010.  No evidence about the relevant standard of care for a nurse practitioner was

11   presented to this Court.  Plaintiff did not offer an expert on nursing, or establish that

12   Dr. Colaprete is qualified to state the standard of care for a nurse practitioner giving

13   primary care.

14           Plaintiff has not proven that the standard of care was not met on December 1,

15   2010, when Plaintiff was seen in Neurology.  Plaintiff received a full physical

16   examination and neurological examination.  The only neurological abnormality was

17   difficulty with tandem walking.  Dr. Bui, the attending neurologist who personally

18   treated Plaintiff, adequately explained why this finding did not cause him to order a

19   head CT. As with prior presentations at the VAMC, Plaintiff's treating physicians had

20   access to his medical records, including the negative CT scan performed on September

21   18 after Plaintiff made similar complaints.  The doctors were also informed that

22   Plaintiff's headaches had apparently subsided after taking propranolol, a preventative

23   migraine medication, and returned when he stopped taking the medication.  Although

24   Plaintiff had already restarted propranolol, Dr. Bui believed that it was too soon for the

25   medication to again have an effect.  No evidence was presented to undermine the

26   reasonableness of the treating physician's conclusion that Plaintiff was responding to

27   propranolol.  Given the patient's history, recent negative CT scan, his account of his

28   headaches responding to propranolol, and the lack of significant neurological findings,

1  this Court cannot conclude that Plaintiff has proven that the standard of care was not

2  met.

3       Plaintiff also has not proven that his treatment fell below the standard of care on

4  December 3. Plaintiff did not argue that the doctors missed an acute brain bleed during

5  this visit. Plaintiff again presented with a severe headache similar to headaches for

6  which he had been treated in the past. The physicians on December 3 not only knew

7  that Plaintiff had presented with a similar headache and had a negative CT scan on

8  September 18, they also knew that he had been examined by headache specialists only

9  two days prior, and that the experts had diagnosed Plaintiff with tension and migraine

10  headaches. Plaintiff again presented without neurological symptoms, and reported

11  responding to medication. This Court cannot conclude that the doctors did not meet

12  the standard of care on December 3.

13       The evidence before this Court indicates that Plaintiff's headaches before

14  December 5 might have been a symptom of a chronic subdural hematoma. However,

15  the evidence is also consistent with the possibility that Plaintiff's headaches had the

16  same cause or causes as on September 18, when he experienced headaches without a

17  chronic subdural hematoma.

18       Although one may wish that a CT scan had been ordered and Plaintiff's subdural

19  hematoma discovered, the standard of care does not require that physicians take all

20  actions which, with the benefit of hindsight, would lead to the best result. Plaintiff's

21  treating physicians can only be held liable if they fail to exercise the reasonable degree

22  of skill, knowledge, and care ordinarily possessed and exercised by members of the

23  medical profession in the community under similar circumstances. As Plaintiff has not

24  shown by a preponderance of the evidence that any treatment provider failed to do so,

25  his claim for medical malpractice cannot succeed.

26  B. Causation

27       Even if the failure to order a CT scan and diagnose the chronic subdural

28  hematoma fell below the relevant standard of care, Plaintiff has failed to meet his

1    burden to prove that this caused his alleged damages.  Plaintiff argues that the failure
2    to diagnose the chronic subdural hematoma allowed the acute subdural hematoma to
3    occur, requiring emergency brain surgery, and causing Plaintiff to suffer from the
4    effects of the surgery and acute subdural hematoma.

5         At the outset, Plaintiff has not established by a preponderance of the evidence
6    that prompt diagnosis would have avoided the acute subdural hematoma or the surgery.
7    Plaintiff points out that an earlier diagnosis would have allowed the doctors to reverse
8    the effects of the Coumadin.  However, Plaintiff had experienced blood clots, a
9    potentially serious condition, and it is unclear what decision would have been made
10   regarding the Coumadin, particularly when Plaintiff's chronic subdural hematoma was
11   not causing neurological problems.  It is also unclear whether doctors would have
12   recommended surgery to remedy the effects of the chronic subdural hematoma.  That
13   Scripps Mercy Hospital promptly reversed the effects of the Coumadin is of no
14   significance, given that Plaintiff clearly required surgery under those circumstances and
15   could not be on the blood thinner during surgery.  Although Plaintiff's argument that
16   surgery could have been avoided is plausible, he failed to present enough evidence
17   about the likely reaction of his doctors to an earlier diagnosis for this Court to conclude
18   that he more likely than not would have avoided the acute subdural hematoma and the
19   surgery.

20        Additionally, Plaintiff was unable to link the delay in diagnosis with his alleged
21   damages.  Causation is the subject of expert medical testimony.  *United States v.*
22   *Urena*, 659 F.3d 903, 908 (2011).  This Court determines that Plaintiff did not provide
23   the necessary expert testimony on causation.

24        Plaintiff's sole expert witness discussed the possible consequences of an acute
25   subdural hematoma and surgery.  However, the expert was not a neurologist or a
26   psychiatrist and did not present any evidence that tied the particular problems of
27   Plaintiff to a delay in diagnosis.  For instance, the doctor did not conduct or review
28   neuropsychological testing designed to determine what cause or causes led to particular

cognitive difficulties. Neither of Defendant's expert witnesses concluded that Plaintiff's alleged damages were caused by the delay in diagnosis, or that they were caused by the acute subdural hematoma and surgery.

Plaintiff points to brief statements in medical records in which various treating health providers indicate that certain cognitive and psychological problems were caused by the subdural hematoma or the surgery. However, a treatment provider who has not been certified as an expert may testify as to the nature and extent of injuries, but not as to their cause. *Urena*, 659 F.3d at 908. None of the treatment providers in this case were offered as expert witnesses. Even if these records are, as Plaintiff claims, admissible as statements against interest, the exception to the hearsay rule does not create an exception to the requirements for expert testimony. The Federal Rules of Evidence require that expert opinions be subjected to proper scrutiny before they are accepted by courts. As the writers of these records, and their methodology, have not been so vetted, this Court cannot accept that they were correct in determining that the subdural hematoma, or the surgery, or the delay in diagnosis, caused the damages alleged.

The concern with relying upon untested written records is especially acute where the writer does not testify. The writer is not subject to questioning about their methodology and conclusions, and this Court cannot assess their credibility in person. As such, the records are presented without the necessary facts that would allow this Court to conclude that the conclusions could be given significant weight.

Additionally, the evidence indicates that the treating physicians lacked the necessary information to reach conclusions about causation to a reasonable degree of certainty and reliability. No neuropsychological testing of Plaintiff has been conducted. Plaintiff did not point to any record that shows that the providers applied differential diagnosis techniques to confirm or reject their conclusory comments on causation. The records do not reveal a methodical effort to distinguish damages caused by the delay in diagnosis with damages that might have resulted from the chronic

subdural hematoma, even if it had been more quickly diagnosed.  Some of the records indicate that the doctors did not know relevant facts, such as Plaintiff's continuing use of marijuana.

The record also reveals other possible causes of Plaintiff's cognitive difficulties and symptoms.  Plaintiff has, among other things, a history of alcoholism and illegal drug use, a daily marijuana habit, other medical problems, and a long list of medications intended to treat a variety of medical problems.  For instance, Plaintiff was placed on atropine, a medication known to cause cognitive problems.  Plaintiff experienced anxiety problems before the headaches due to other medical procedures. This Court cannot conclude by a preponderance of the evidence that any of Plaintiff's alleged damages were in fact caused by a *delay* in diagnosing his chronic subdural hematoma, rather than by the chronic subdural hematoma itself or the many other potential causes.  As Plaintiff has not proven that the alleged negligence caused his damages, his medical malpractice claim cannot succeed.

## CONCLUSION

This Court concludes that Plaintiff has not met his burden of proof to establish that the treatment of Plaintiff fell below the applicable standard of care, and has not met his burden to show that the failure to met the standard of care caused Plaintiff's damages.

Judgment shall be entered against the Plaintiff and in favor of the Defendant.

**IT IS SO ORDERED.**

Dated: April 22, 2014

HON. ROGER T. BENITEZ
United States District Judge